## M. E. AND S. W. MILLER v. G., C. & S. F. R'y Co.

(Case No. 2088.)

1. RAILROADS—SUBSCRIPTION—RIGHT OF WAY—LOCATION OF DEPOT—OBLIGATION—CONSTRUCTION OF CONTRACT—GOOD FAITH—Suit was brought by a railway company upon certain notes executed by citizens of a town, the consideration being the early construction of the road to that town. The condition was annexed to each note, that, if the road was not completed to the town by a certain date, the obligations were to become null and void. About the same time a number of citizens, including defendants, executed a bond in the sum of $7,000, conditioned that " we shall cause to be secured to the said railway company all necessary conveyances for right of way for said company through our county and town, etc., *when demanded by it*, on any line it may locate that touches the corporate limits of the town, etc." The charter of the company provided that the road should run as near as practicable to the town referred to, and, in the event its citizens donated to the company the necessary right of way for road, switches and turnouts, through the town, and sufficient ground for depot purposes, the depot should be located within half a mile of the court house. At the time the subscriptions were raised, in lieu of which the notes were given, one of the directors of the road, acting as spokesman for himself and several other directors who were present, said, in a public speech to the citizens : "We desire you shall procure for us the right of way along two lines through your town and county, thereby enabling us to procure the most *practicable route*.

Then, we shall expect you to procure the necessary ground in your city for depot purposes ; and, lastly, we ask you to donate a specified sum of money." *Held* ·

(1) That the instruments sued upon, together with the right of way bond, taken as one transaction, construed in the light of the circumstances surrounding the parties at the time, and with reference to the obligations imposed upon the company by its charter, must determine the right to recover;

(2) Evidently it was the purpose of the parties, at the time the notes were made, that in consideration of the sum subscribed and the right of way, the railway company would survey and construct its road into the corporate limits of the town; and, the necessary grounds for depot purposes being secured and donated by the citizens, the company would establish its depot within half a mile of the court house.

(3) In order to put the citizens at default, the railroad company should have selected the most practicable route, established it into the town to within half a mile of the court house, selected, surveyed, and marked off the grounds necessary for depot purposes, and then notified the citizens composing the committee appointed to secure the right of way and depot grounds, and made " demand " of the same for the purposes stated;

(4) Until this was done, the citizens could not have known what lands to purchase, nor had they the power to institute, in their own names, proceedings to condemn the land;

(5) It is the legitimate inference that, at the time the notes were made, all parties understood that the company would select and survey its route and depot grounds, and in case the citizens failed to purchase such land, the railroad company would institute proceedings for its condemnation, and call upon the citizens to pay whatever damages and costs were thereby incurred.

(6) If the citizens had a fair opportunity of donating the right of way and depot grounds, and failed to do so, the failure of the company to locate the depot in the town, as agreed, was no defense to their action.

(7) It was the duty of the company to give the citizens definite notice of the locations desired for right of way and depot. Until this was done, the company was not authorized to conclude that they were unable or unwilling to comply with their promises.

(8) See opinion for evidence, showing a want of that good faith and fair dealing, on the part of the company, which would entitle it to recover on the notes sued on.

APPEAL from Galveston. Tried below before the Hon. Wm. H. Stewart.

The opinion states the case.

*W. A. McDowell* and *Hume & Shepard,* for appellants, cited : I. & G. N. Ry. Co. *v.* Dawson, 62 Tex. 260 ; Clark *v.* Haney, 62 Tex. 511; James *v.* King & Davidson, 5 Tex. Law Rev.,·vol. 5, 216 ; Henderson *v.* Ry. Co., 17 Tex. 560; G. C. & S. F. Ry. Co. *v.* Jones, 63 Tex. 524 ; Taylor *v.* Merrill, Tyler, Term, 1885, 2 Wharton on Ev., secs. 928, 929 ; Addison on Conts., p. 368, sec. 242; Id., p. 370, sec 243; Id., p. 376, sec. 247; Stephens' (Reynolds) Dig. Ev., art. 90, pp. 122;

125, notes *d, e, g, i;* Ry. Co. *v.* Hodnett, 36 Ga. 669; Taylor *v.* Fletcher, 15 Ind. 80; Shugart *v.* Moore, 78 Pa. St. 469; Powelton Coal Co. *v.* McShain, 75 Pa. St. 238; Oliver *v.* Oliver, 4 Rawle 141; Campbell *v.* McClanachan, 6 Serg. and R. 171; Weaver *v.* Wood, 9 Barr. 220; Bonny *v.* Morrill, 57 Me. 368; Quimby *v.* Stebbins, 55 N. H. 420; Preble *v.* Baldwin, 6 Cush., 60 Mass. 549; Davenport *v.* Mason, 15 Mass. 85; Stoops *v.* Smith, 100 Mass. 63; Penn. Mut. Ins. Co. *v.* Crane, 134 [Mass. 282; Murray *v.* Doke, 46 Cal, 644; Taylor *v.* Gillman, 25 Vt. 411; Lawrence *v.* Smith, A. & E. Ry. Cases 604; Hoag *v.* Owen, 60 Barb. 34; Brown *v.* Morange, 15 Pittsburg Legal Journal, N. S., 220; H. & T. C. Ry. Co. *v.* Harry & Bros., 63 Tex. 256; Smith *v.* Elliott, 39 Tex. 201; Von Hoffman *v.* Quincy, 4 Wall. 550; Bishop on Conts., secs. 568, 569; 2 Parsons on Conts. 500, 515, 655; State *v.* Allis, 18 Ark. 260; Rogers *v.* Allen, 47 N. H. 529; Clark *v.* Pinney, 7 Cowen, 681; Webster *v.* Rees, 23 Ia. 269; Charter S. P. Laws 1875, 24; Constitution 1876, art. 10, sec. 9; R. S., arts. 4224, 4225.

*Ballinger, Mott & Terry,* for appellee, on parol evidence, cited: Pierce on Railroads, 57-59; Redfield on Railways, 186, 187; 1 Rorer on Railroads, 101, 154; Wight *v.* Shelby R'y Co., 16 B. Monroe 6; Gelpeke *v.* Blake, 15 Ia. 387; Railsback *v.* Turnpike Co., 2 Ind. 657; Harvey *v.* Laflin, Id. 480; Johnson *v.* R'y Co., 11 Ind. 284; Eakright *v.* R'y Co., 13 Ind. 410; McLure *v.* R'y Co., 90 Pa. St. 269; V. R'y Co. *v.* Parker, 84 Ill. 613; Braddock *v.* R'y Co., 44 N. J. L. 336; s. c., 16 A. & E. R'y Cases, 436; Thigpen *v.* M. C. R'y, 32 Miss. 347; R'y Co. *v.* Penry, 38 Ia. 255; Martin *v.* R'y Co., 8 Fla. 370; Johnson *v.* R'y Co., 9 Fla. 299; 1 Addison on Cont., secs. 242, *et seq.*; Fox *v.* R'y Co., 46 Ind. 36; Dill *v.* R'y Co., 21 Ill. 92; Ellison *v.* R'y Co., 36 Miss. 586; R'y Co. *v.* Leach, 4 Jones N. C. 343; R'y Co. *v.* Gammon, 5 Sneed 568; R'y Co. *v.* Cross, 20 Ark. 454; 87 Pa. St. 332; Jackson *v.* Stockbridge, 29 Tex. 394; S. M. & M. R'y *v.* Anderson, 51 Miss. 829.

On forfeiture, they cited: Platt on Cov., star p. 903; Law Library, note of Sergeant Williams, 1 Wm. Saunders, 320c; 2 Parsons on Cont. 528, and that part of note pp. 531, 532; 2 Chitty on Cont., 1082, note 1083; 2 Smith's Leading cases, 26; 1 Wharton on Cont. sec., 5518; Benjamin on Sales, sec. 562, and numerous cases cited by those authors; Boone *v.* Erie, 1 H. Bl. 273; Ritchie *v.* Atkinson 10 East. 295, approved in Lowber *v.* Bangs, 2 Wall. 736; Carpenter *v.* Cresswell, 4 Bing. 409; Obermyer *v.* Nichols, 6 Binn. 159; Tompkins *v.* Elliott, 5 Wend. 496; McCullough *v.* Cox, 6 Barb. 386; Pepper *v.* Haight, 20 Barb. 430; Lewis *v.* Weldon, 3 Rand. 71; Todd

*v.* Summers, 2 Gratt. 167; Mason *v.* Chambers, 4 Littell, 253; Allen *v.* Saunders, 7 B. Monroe 593; Weaver *v.* Childress, 3 Stew. 361; Keenan *v.* Brown, 21 Vt. 86; Stavers *v.* Curling, 3 Bing. 169.

T. M. HARWOOD, SPECIAL JUSTICE.—This suit was brought by appellee, on December 8, 1884, upon two obligations, or subsidy notes, executed by appellants, for the aggregate sum of $1,200. One of these obligations, for the sum of $1,000, was executed June 18, 1880, and the other, for $200, on June 26, 1880.

These two writings were executed by appellants, who are citizens of Belton, in Bell county. Similar obligations, to the aggregate sum $75,000, were executed by citizens of Belton, payable to appellee at the same time. The consideration expressed upon the face was, "the early construction of the Gulf, Colorado & Santa Fe railway to the town of Belton."

The following condition formed a part of each, viz : "The condition of this obligation is such, that if the Gulf, Colorado & Santa Fe railway is not completed to the town of Belton by the first day of March, 1881, then this obligation is to become null and void."

About the same time, a large number of the citizens of Belton, including those who executed the obligations above mentioned, delivered to appellee a bond, in the sum of $7,000, conditioned as follows : "The condition of this obligation is such, that if we shall cause to be secured to the Gulf, Colorado & Santa Fe railway company, all necessary conveyances for the right of way for the said company, through the county of Bell, and the town of Belton, in the state of Texas, when demanded by it, on any line it may locate that touches the corporate limits of Belton, then this obligation to be null and void."

In answer to the suit, the defendants pleaded as follows :

1. That the notes were given upon a promise and a consideration contrary to sound public policy.

2. That the railway was not completed to Belton by March 1, 1881.

3. That the execution of the notes was procured through the promise of the company to build its railway, upon a designated route, into the town of Belton, and to locate its depot at a point within one-half mile of the court house therein ; that the town and citizens were ready and willing to donate the right of way and necessary depot grounds, whenever needed ; that the company, in disregard of its promise, and requirements of the law under which it was built, changed its course, so as to run around the town, and established its depot outside the corporate limits, and more than a mile from the court house.

4. That the notes were also signed in full faith in the representa-tions of the company, that Belton should remain the terminus for two years, and that no rival towns should be built near it, which representations had been falsified by the company.

The plaintiff, by supplemental petition, excepted specially to all that part of the answer after the general denial. There was also a denial that the city of Belton, or its citizens, ever tendered to the com-pany right of way through the town, and depot grounds; also denial that the city, or its citizens, were ready or able to grant such right of way or depot grounds. Plaintiff also alleged that it would have run its road into the city, and would have built its depot within half a mile of the court house, had the right of way and depot grounds been furnished by the citizens; and that it was still ready to do so, upon the same conditions.

The cause was submitted to the court, without a jury. Judgment was rendered for plaintiff, and defendants appealed. At the request of the parties, the presiding judge filed his findings of fact and con-clusions of law.

The Gulf, Colorado & Santa Fe railway company was chartered by special act of the legislature of May 28, 1873—amended February 5, 1875. In the eighth section of the act is the following provision: "Commencing at the city of Galveston, thence northwest on the most direct and practicable route, so as to intersect the G., H. & S. A. railway, on the dividing ridge between the Brazos and San Bernard rivers; thence, on an air line, as near as practicable, to the town of Brenham, in Washington county, Caldwell, in Burleson coun-ty; thence, to the town of Cameron, in Milam county; thence, to the town of Belton, in Bell county; and, in the event that the citizens of each of said towns shall donate to said company the necessary right of way for roads, switches and turnouts, through said towns, and sufficient ground for depot purposes, the depot shall be located within half a mile of the court house in each of said towns."

By June 11, 1880, the company had made such progress in building its road that it had its line under contract up to a place called the Knobbs, about twelve or fifteen miles southeast of Belton.

It is evident the learned trial judge, in interpreting the contract, the basis of this suit, considered the appellee's charter, with all of its obligations thereunder, as entering into and forming a part of the agreement made with appellants, and, in this, we fully concur. In construing the obligations sued upon, all the facts and circumstances surrounding the parties, going to throw any light as to what were the objects and purposes of the contracting parties, should be con-

sidered. The second error assigned is to the effect that the court erred in holding that plaintiff's railway was completed to the town of Belton by March 1, 1881, in the sense of the contract, and under the requirements of the law.

The several instruments sued upon, together with the indemnity or right of way bond, taken as one transaction, and construed in the light of the circumstances surrounding the parties at the time, and construed with reference to the obligations imposed upon appellee by the law, under its charter, must determine the right of the appellee to recover in this suit.

Evidently, it was the purpose of the parties at the time the obligations sued upon were given, that, for the consideration of the sum of $75,000 (of which the notes sued upon were a part), and the further consideration of the right of way through the county of Bell and through the town of Belton, the appellee would survey and construct its railway to and into the corporate limits of the town; and, the necessary grounds for depot purposes being secured and donated by the citizens, the appellee would locate and establish its depot within half a mile. of the court house. This, as was universally understood at the time of the contract, was fixed and required by the charter. This, too, was the fair and unmistakable construction to be put upon the propositions made by Mr. Sealy at the very time this amount was subscribed and promised by appellants. Copying from the findings of fact made by the trial judge, Mr. Sealy, in a public speech to the citizens of Belton, on the day this subscription was made, he being a director of the company and speaking for himself and several other directors who were present, said: "1st. We desire you shall procure for us the right of way along two lines through your town and coun-- ty, thereby enabling us to choose the most practicable route. Then, we shall expect you to procure the necessary ground in your city for depot purposes; and last, though not least, we ask you to donate $75,000, which is but a portion of the extra cost to run our road into town, and out again." * * *

The learned trial judge further finds from the evidence: "That soon after the speech of Mr. Sealy, subscriptions were commenced. * * That the appellants, M. E. and S. W. Miller, subscribed $1,000, and appellant, M. E. Miller, the further sum of $200, and that afterwards in lieu of said subscriptions of $1,000 and $200, M. E. and S. W. Miller executed and delivered to Walter Gresham, agent of appellee, the two notes sued on in this cause."

The corporate limits of the town consist of one thousand, two. hundred and eighty acres, in a perfect square, the court house being

in the middle of the square. Before June 12, 1880, the date of the
speech of Mr. Sealy, and the date of the subscriptions, two lines had
been surveyed by appellee, from the then terminus of the road to and
into the corporate limits of the town. One passed within a half
mile of the court house, and the other a little further off, but neither
had been definitely selected and adopted by the railway company as
the line selected and adopted as the "most practicable route." The
trial judge, from the evidence, further finds as follows: "The plain-
tiff (appellee) thereafter, sometime in July, 1880, ran a line on the
Birdsdale route, into the northeast side of the town, to a point not far
from the court house square, and Walter Gresham, as plaintiff's
agent, conferred with one or two members of the citizens' committee,
to know if they would give the right of way through the town, on
that line, and was informed by said one. or two members of the com-
mittee that the right of way through that part of the town would cost
a greater sum of money than the citizens could afford to raise. The
cost of that right of way, with necessary depot grounds, would have
been about $10,000. The plaintiff thereafter, about the middle of
August, permanently located its route through the north part of the
town by condemnation, the plaintiff paying about $500 for the part so
condemned; and established depot grounds just outside of the corpo-
rate limits, paying for the depot grounds ·several hundred dollars.
* * * The depot and depot grounds, are about three hundred feet
outside of the corporate limits of Belton and are about two hundred
or three hundred feet over a mile from the court house, and have so
remained from about the middle of August, 1880, to the present time.
* * * The road, as permanently located and constructed, enters
the corporate limits about four hundred feet west of the northeast
corner of the corporate limits of the town, and runs, thence westwardly
just inside of the corporate limits, about forty feet inside the corpo-
rate limits, about two thousand feet, just keeping inside of the corpo-
rate limits, and then leaves the corporate limits at a point about two
thousand four hundred feet west of the northeast corner of the cor-
porate limits; and, although there is about two thousand feet of plain-
tiff's road within the corporate limits, no part of said two thousand
feet is more than fifty feet inside of the northern boundary of the cor-
porate limits.

The depot is about eight hundred yards from the point where
the plaintiff's road leaves the corporate limits, and the depot
is about three hundred and fifty yards from the northern boundary
line of the corporate limits, and the road makes a very gentle curve
all of the way from the point where it enters the corporate limits to

the depot. The distance from the court house to the depot is a little over a mile." * * *

In the view we take of the case, it can make no difference upon which surveyed route the road was constructed to the corporate limits of the town, because, as appears from the testimony, the road might have been extended into the corporate limits, upon either route, and a depot located within a half mile of the court house.

The question to be considered is, did appellee, by running "the line on the Birdsdale route into the northeast side of the town, to a point not far from the court house square, and, by conferring with one or two members of the citizens' committee, to know if they would give the right of way through the town on that line," comply fully with its obligation growing out of the contract with appellants. In order to put the citizens at default, the appellee should have selected the most practicable route, and surveyed and established it into the town, to within half a mile of the court house, and have selected, surveyed, and marked off the grounds necessary for depot purposes, and then have notified the citizens composing the citizens' committee appointed to secure the right of way and depot grounds, and made, in the language of the right of way bond, "demand" of the same, for the purposes stated. Not until this was done could the citizens have proceeded to secure, by purchase or condemnation, the the titles to the land. Until this was done, they could not have known what ground to secure, by purchase or legal process ; nor had the citizens the power to have instituted proceedings in their own names, to condemn the land. It was alone by the railway company that these proceedings could be instituted. Is it not the only legitimate inference, that, at the time the obligations sued upon were executed, all parties understood that the company would select its route, cause it to be surveyed, as also the depot grounds; and if the citizens should fail to contract with the owners for its purchase, then the railway company would institute proceedings for its condemnation, and call upon the citizens to pay whatever damages and costs were thereby incurred? If such was not the understanding, why did they require of the citizens the indemnity, or right of way bond?

Although many other questions have been discussed by counsel, we regard this as the turning point in the case. The plaintiff sues upon certain obligations, the meaning of which is perfectly clear, and, in reply to the defenses set up by the defendant, the plaintiff specially denies that the town of Belton, or the citizens thereof, ever tendered to plaintiff, depot grounds and right of way through the town ; and specially denies that the citizens were ever willing or able to donate

to plaintiff the necessary depot grounds and right of way through the town. If this denial is sustained by the evidence, then we see no obstacle in the way of the plaintiff's recovery. For, if the citizens of Belton, with a fair opportunity of donating the right of way and depot grounds, failed to do so, then they cannot complain of the action of the company in the premises.

But, is this true? There is certainly very little proof of it in the record. The only proof adduced is, that sometime after the obligations had been signed, the agent of the plaintiff conferred with one or two of the citizens committee, who expressed the opinion that the people were not able to bear the expense of locating the track and depot so near the center of the town, inasmuch as it would cost about $10,000.

The evidence of the inability of the people of Belton to furnish the depot grounds, etc., seems to us extremely feeble. No such location of the line or depot was made as would indicate to the citizens of the town the desire of the company to have the right of way on any designated line, or depot at any particular locality. This was left in uncertainty, and it would have been impracticable for the citizens to comply with the demands of the company, until this was done. It was the duty of the railway company to give to the citizens definite notice of the locations desired for right of way and depot. And, until this was done, the company was not authorized to come to the conclusion that they were either unable or unwilling to comply with their promises.

We are led to these conclusions by the testimony of the plaintiff's own witnesses. They do not disguise the fact that their object was to keep the people in the dark, as to the location of the road and the depot. One of their witnesses states that they went there, cautioned to avoid giving information on that subject. This witness admits that it taxed their ingenuity to ward off the inquiries of the people on that subject

This witness states : " We understood from the people of Belton that they were unanimous in giving the necessary depot grounds and right of way. That was part of the contract, and they were anxious for it. There was nothing to cause us to fear they would not do it. There was quite a warm feeling for the road, and a disposition to do anything required of them." This witness also says : "The committee was authorized to go and make representations to the town of Belton, and make contracts with them; and that the road had to abide by whatever they did." This witness also said : " That he told Mr. Burr (one of the Belton committee) that we would comply

with our part of the contract, and would run through the corporate limits of Belton;" and, being asked by counsel, "Do you call it running through the corporate limits by dipping in, on one side, and making a curve and running out again on the same side?" said, "Yes, sir; we agreed to put it through the city limits, and we did so."

He also says : "We knew that when our road went to a town, in order to force us to go through the town, the people had to give us depot grounds and right of way, and that they were not deterred in locating the right of way through the town, and placing the depot grounds in the town, by their refusal to give it." Being asked, "You were all satisfied that they had the money in Belton to furnish the right of way and depot grounds wherever you desired it?" said, "Yes; we thought they would comply with their part of it."

Another witness says that his business was "to keep silent," or, as he expresses it, "to play mum," and ward off inquiry. All this time, both witnesses saw that the people of Belton were deceived, or, as they expressed it, were "deceiving themselves," and they seemed to have thought that their duty to the company required them not to undeceive the people.

The testimony of one of the witnesses, to the effect that the directors who went to Belton, had been cautioned to communicate nothing of the location of the route and depot, is very suggestive, when considered in connection with the condition found in the right of way bond, and when considered with reference to the map showing the actual location of the track and depot on the ground. The bond reads thus : " The condition of this bond is such, that, if we shall cause to be secured to the G., C. & S. F. railway company all necessary conveyances for right of way for said company, through the county of Bell and *town of Belton*, etc., etc., *when demanded by it*, on any line it may locate, *that touches the corporate limits of the town of Belton*, etc.

The form of the bond, and also the notes, as appears from the testimony, had been agreed upon before the committee came to Belton. Now, the route actually located and built upon did not enter the town upon either of the lines along which the people had secured the right of way. But, running some distance above the Birdsdale route, it passed north of the northeast corner of the town tract; then, in order to "touch" the corporate limits, it deflected a little south, or, as the trial judge states in his findings of fact, "very gently curves to the south," until it crosses the corporate limits, and then, running along just inside the corporate limits for a few hundred yards, it "very gently curves to the north," and passes without the corporate limits to a tract of land three hundred and fifty yards north of the

corporate limits, owned by the company, and there established its depot.

The plaintiff having obtained the obligations sued upon by the means herein stated, this court is asked to enforce their collection. This we cannot do, because, in our opinion, there was in the whole transaction a want of that good faith and fair dealing which the makers of these obligations had good right to expect and demand of the company.

This cause having been tried before the court, without a jury, it is ordered that the judgment of the court below be reversed, and that such judgment be rendered in this court as should have been rendered below, and that appellants recover of appellee all costs in this court and in the court below.

REVERSED AND RENDERED.

[Opinion delivered March 13, 1886.]